IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| SANDRA J. MURPHY | | |
| Claimant, | | No. 18-CV-61-LRR |
| vs. | | |
| NANCY BERRYHILL,<br>Acting Commissioner of<br>Social Security, | | **REPORT AND<br>RECOMMENDATION** |
| Defendant. | | |

---

Claimant, Sandra J. Murphy ("Claimant"), seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34 and for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I. BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 12) and only summarize the pertinent facts here. This is an appeal from a denial of benefits in a case that was reheard on remand from the U.S. District Court for the Northern District of Iowa. On remand, the ALJ was ordered to determine whether the opinions of Dr.

Mittauer, Community Support Worker Tanya Moyle, and Social Worker Karen Penick were inconsistent with substantial evidence on the record.[1] (AR[2] at 396, 517-18.)

Claimant was born on July 31, 1972. (*Id.* at 140.) Claimant has a bachelor's degree in education. (*Id.* at 425.) The ALJ found Claimant "has at least a high school education and is able to communicate in English." (*Id.* at 410.) Claimant allegedly became disabled due to mental illness on January 7, 2010 when she was 38 years old. (*Id.* at 140, 181, 182.) She was 40 years old at the time of the ALJ's original decision on September 17, 2012. (*Id.* at 11-22.) Claimant filed her initial claim on December 7, 2010. (*Id.* at 140-41.) Claimant was initially denied benefits on February 28, 2011. (*Id.* at 65-84.) Claimant filed for reconsideration on April 25, 2011 and was again denied on May 26, 2011. (*Id.* at 85-86, 93.) Claimant filed a Request for Hearing on July 20, 2011. (*Id.* at 98-99.) A hearing was held on August 22, 2012 in Cedar Rapids, Iowa, with Claimant, her attorney, ALJ Eric Basse, and vocational expert Carma Mitchell present. (*Id.* at 27-62.) Claimant and the vocational expert both testified. (*Id.* at 32-62.)

The ALJ issued his *decision denying Claimant benefits on September 17, 2012.* (*Id.* at *11-22.) On November 14, 2012, Claimant filed a Request for the Appeals Council to review the ALJ's decision.* (*Id.* at *7.) On October 22, 2013, the Appeals Council found there was no basis to review the ALJ's decision.* (*Id.* at *1-5.)* On December 18, 2013, Claimant timely filed a complaint in this Court. (Case No. 13-CV-141, Doc. 3.) The Honorable Jon Stuart Scoles remanded the case to the Commissioner of Social Security on September 26, 2014. (AR at 518.)

---

[1] Claimant makes no argument regarding how the ALJ weighed the opinions of Community Support Worker Tanya Moyle and Social Worker Karen Penick in his opinion on remand. Therefore, any arguments related to the weight given those opinions have been waived.

[2] "AR" cites refer to pages in the Administrative Record.

While that civil action was still pending, Claimant filed new DIB and SSI applications on September 9, 2014. (*Id.* at 521.) On February 11, 2015, the Appeals Council remanded Claimant's claim for a new hearing pursuant to the Court's remand order and also directed the ALJ to consolidate the remanded claim with Claimant's new applications. (Id. at 519-23.) A video hearing was held on August 5, 2015 with ALJ Eric Basse and vocational expert Roger Marquardt in West Des Moines, Iowa and Claimant, her attorney, and Community Support Worker Tanya Moyle in Cedar Rapids, Iowa. (*Id.* at 422-65.) Claimant, Ms. Moyle, and the vocational expert testified. (*Id.* at 425-64.) On November 17, 2015, the ALJ entered a decision denying benefits. (*Id.* at 396-412.) Claimant's counsel filed exceptions to the ALJ's decision on December 22, 2015 and three other times before the exceptions were made part of the record on October 6, 2017. (*Id.* at 708.)

On March 27, 2018, the Appeals Council denied review of the ALJ's decision. (*Id.* at 386.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. See 20 C.F.R. § 416.1481. On June 5, 2018, Claimant timely filed her complaint in this Court. (Doc. 3.) By January 8, 2019, the Parties had filed their briefs. On January 9, 2019, the Honorable Linda R. Reade, United States District Court Judge, referred the case to me for a Report and Recommendation.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if he or she is able to do work that exists in the national economy, but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic

work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his or her application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id*. Pts. 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in substantial numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ'S Findings*

The ALJ made the following findings at each step with regard to Claimant's disability status:

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date. (AR at 398.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: "attention deficit hyperactivity disorder (ADHD), major depressive disorder, generalized anxiety disorder/social phobia, personality/obsessive compulsive disorder (eating disorder), obesity, and obstructive sleep apnea by report." (*Id*. at 398-99.)

At step three, the ALJ found that none of Claimant's impairments met or equaled a presumptively disabling impairment listed in the regulations, specifically listings 12.02, 12.04, 12.06, or 12.08. (*Id*. at 399.)

At step four, the ALJ found that Claimant's RFC allowed her to perform a range of sedentary to light work as defined in 20 C.F.R. Sections 404.1567(b) and 416.967(b) because Claimant is

> capable of carrying/lifting twenty pounds occasionally and ten pounds
> frequently, can sit for six hours of an eight hour day, and can stand/walk
> for four hours of an eight hour day. The claimant can do simple, routine,
> and repetitive tasks, have no contact with the public, and occasionally with
> coworkers, and supervisors and no production rate pace.

(*Id.* at 400.) At step five, the ALJ found that despite Claimant's RFC, there were jobs that existed in "significant numbers in the national economy" Claimant could still perform, including shipping and receiving weigher; marker II; mail clerk, nonpostal; document preparer; and charge account clerk. (*Id.* at 411.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*) The disputes in this case arise at steps four and five.

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*,

349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## C.    *Duty to Develop the Record*

The administrative hearing is a non-adversarial proceeding, and the ALJ has a duty to "fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Because the ALJ has no interest in denying Social Security benefits, the ALJ must act neutrally in developing the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971)); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994) (opining that "[t]he goals of the [ALJ] and the advocates should be the same: that deserving claimants who apply for benefits receive justice") (quoting *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir.1988)) (bracketed information added).

## III.    DISCUSSION

Claimant alleges the ALJ committed reversible error in (1) failing to give good reasons for the weight afforded to the opinion of her treating psychiatrist, Dr. Mittauer, which Claimant's argument necessarily assumes could have changed the ALJ's conclusion at either step 3 or step 4 of the analysis, and (2) by denying benefits as step 5 based on an RFC that was not supported by substantial evidence in the record. In addition, Claimant challenges the validity of the ALJ's decision because Claimant contends the ALJ was not properly appointed under *Lucia v. SEC,* 138 S. Ct. 2044 (2018).

After conducting a thorough review of the administrative record, I find that the ALJ did not err at any step in the process. I will address each of Claimant's arguments, in turn.

## A. *The ALJ properly evaluated Dr. Mittauer's Opinion.*

Dr. Mittauer has been Claimant's treating psychiatrist since April 21, 2010. Between April 2010 and June 2014, Dr. Mittauer saw Claimant on 14 occasions. (AR at 274-75, 279-80, 285-91, 357-58, 363-64, 367-68, 377-78, 878-87.) On April 21, 2010, Dr. Mittauer diagnosed Claimant as having Major Depressive Disorder, single-episode/severe, without psychotic features; Attention Deficit Hyperactivity Disorder, not otherwise specified ("NOS"); Anxiety Disorder NOS (with panic attacks); Generalized Anxiety Disorder; Eating Disorder NOS (impulsive over eating); and Personality Development Disorder, NOS. (*Id.* at 289.) These diagnoses have remained fairly consistent since Claimant's first meeting with Dr. Mittauer, except that Dr. Mittauer changed the major depressive disorder diagnosis to "single episode (moderate), without psychotic features" on August 6, 2010. (*Id.* at 280.) The rest of Dr. Mittauer's treatment notes document either "moderate" major depressive disorder (*Id.* at 275, 358, 364, 377, 879) or "mild" major depressive disorder (*Id.* at 367, 881, 883, 888.) Claimant was eventually diagnosed with obstructive sleep apnea and now uses a CPAP machine at night, which has improved her sleep. (*Id.* at 426.)

On December 31, 2011, Dr. Mittauer provided a treating source opinion for this case. (*Id.* at 340-45.) The opinion is on a form provided by Claimant's attorney and is a fill-in-the blanks and check-box form. (*Id.*) At the time Dr. Mittauer completed this opinion, he had seen Claimant eight times.

Dr. Mittauer opined on check lists that Claimant had the following limitations related to her abilities to perform work-related tasks: She had no useful ability to use public transportation, but had unlimited or very good abilities to ask simple questions, request assistance, or be aware of normal hazards and take appropriate precautions. (*Id.* at 342-43.) Claimant had limited, but satisfactory abilities to do the following:

- Remember work-like procedures;
- Understand and remember very short and simple instructions;
- Carry out very short and simple instructions;
- Make simple work-related decisions; and
- Adhere to basic standards of neatness and cleanliness.

She had seriously limited, but not precluding, abilities to do the following:

- Accept instructions and respond appropriately to criticism from supervisors;
- Interact appropriately with the general public;
- Maintain socially appropriate behavior; and
- Travel in an unfamiliar place.

Claimant was unable to meet competitive standards in the following areas:

- Maintain attention for a two-hour segment;
- Maintain regular attendance and be punctual within customary, usually strict tolerances;
- Sustain an ordinary routine without special supervision;
- Work in coordination with or proximity to others without being unduly distracted;
- Complete a normal workday and workweek without interruptions from psychologically-based symptoms;
- Perform at a consistent pace without an unreasonable number and length of rest periods;
- Get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes;
- Respond appropriately to changes in a routine work setting;
- Deal with normal work stress;
- Understand and remember detailed instructions;
- Carry out detailed instructions;
- Set realistic goals or make plans independently of others; and
- Deal with stress of semiskilled and skilled work.

(*Id.*) On another checklist, Dr. Mittauer also opined that Claimant had marked functional limitations in her restriction of activities of daily living; difficulties in maintaining social

functioning; and difficulties in maintaining concentration, persistence, or pace. (*Id.* at 344.) He also checked a box that stated Claimant had four or more episodes of decomposition within a 12-month period, each of at least two weeks duration.[6] (*Id.*) In addition, Dr. Mittauer noted that Claimant had "poor concentration, fatigue, panic attacks, distracted so may not finish tasks." (*Id.* at 342.) Dr. Mittauer also checked the following statement, indicating that it applied to Claimant:

> Medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: Three or more episodes of decompensation within 12 months, each at least two weeks long [and] Current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

(*Id.* at 344.) He also stated that Claimant has an "anxiety disorder and difficult[y functioning] independently outside the area of [her] home" and would have difficulty working in a regular job setting because she has "difficulties with timely task completion, works slowly, problems with comprehension." (*Id.* at 344-45.) Dr. Mittauer expected Claimant's symptoms to last for at least twelve months and said they would cause her to miss work more than four days a month. (*Id.* at 345.) Dr. Mittauer checked off that Claimant had the following "signs and symptoms."

---

[6]"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decomposition may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." (AR at 344.)

| Anhedonia or pervasive loss of interest in almost all activities | Intense and unstable interpersonal relationships and impulsive and damaging behavior | Memory impairment—short, immediate, or long term | Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week | Deeply engrained maladaptive patterns of behavior |
|---|---|---|---|---|
| Appetite disturbance with weight change | Feelings of guilt or worthlessness | Difficulty thinking or concentrating | Paranoid thinking or inappropriate suspiciousness | Persistent disturbances in mood or affect |
| Decreased energy | Impairment in impulse control | Blunt, flat, or inappropriate affect | Emotional withdrawl or isolation | Easy distractibility |
| Thoughts of suicide | Emotional lability | Apprehensive expectation | Perceptual or thinking disturbance | Sleep disturbance |
| Seclusiveness | Mood disturbance | Illogical thinking | Generalized persistent anxiety | Psychomotor retardation |

(*Id.* at 341.)

The ALJ afforded Dr. Mittauer's opinion little weight because it was inconsistent with his own treatment notes and the treatment notes of other mental health providers at the Abbe Center, the treatment center where Dr. Mittauer works. (*Id.* at 403, 408-09.) The ALJ decided to "give greater weight" to Dr. Mittauer's overall objective treatment notes instead of to Dr. Mittauer's opinion. (*Id.* at 409.) Claimant asserts that the ALJ did not comply with the remand order because the ALJ once again relied primarily on one treatment note to support his opinion.

I find that the ALJ's opinion regarding how much weight to give Dr. Mittauer's opinion is supported by substantial evidence in the record. As Claimant points out in her

brief, the ALJ appears to have repeated much of his reasoning regarding how much weight to give Dr. Mittauer's opinion from his first decision. (Doc. 13 at 4-5.) The ALJ did, however, augment his opinion by explaining how Dr. Mittauer's own treatment notes undermine his opinion. (AR at 409.) The Court agrees with the ALJ that Dr. Mittauer's own treatment notes do not provide a basis for the opinion he rendered on December 31, 2011. "A treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937 (citation omitted). In addition, the opinion consists of checklists and short fill-in-the blank answers, cites no medical evidence, and gives very little explanation for its conclusions. "'The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value.'. . . Indeed, '[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari,* 270 F.3d 715, 721 (8th Cir. 2001); *Piepgras v. Chater,* 76 F.3d 233, 236 (8th Cir.1996)).

### i. Legal Standard

"'A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record as a whole."[7] *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quotation omitted). "Even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (citation and bracket omitted). However, a treating physician's

---

[7] Under current regulations, a treating physician's opinion is entitled to no special deference. *See* 20 C.F.R. § 404.1520c(c). These regulations were effective as of March 27, 2017. 20 C.F.R. § 404.1527. However, Claimant's claim was filed on December 15, 2010, so the old regulations apply. *See id.*

opinion can be given limited weight if it contains only conclusory statements, contains inconsistent opinions "that undermine the credibility of such opinions," is inconsistent with the record, or if other medical opinions are supported by "better or more thorough medical evidence." *Id.* (citations omitted). An ALJ must "give good reasons" for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); *Walker v. Comm'r, Soc. Sec. Admin.*, 911 F.3d 550, 554 (8th Cir. 2018) (remanding case to the ALJ for further proceedings because ALJ "simply ignore[d]" treating physician's opinion). A proper evaluation of a physician's opinion requires consideration of the following factors: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors.[8] 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c). "[T]he regulations do not strictly require the ALJ to explicitly discuss each factor under 20 C.F.R. § 404.1527(c)." *Kuikka v. Berryhill*, No. 17-CV-374 (HB), 2018 WL 1342482, at *5 (D. Minn. Mar. 15, 2018) (quoting *Mapson v. Colvin*, No. 14–CV–1257 (SRN/BRT), 2015 WL 5313498, at *4 (D. Minn. Sept. 11, 2015) (noting internal brackets omitted)).

### ii. *Analysis*

#### a. *Examining Relationship*

"Generally, [ALJs] give more weight to the medical opinion of a source who has examined [a claimant] than to the medical opinion of a medical source who has not examined [a claimant]." 20 C.F.R. § 404.1527(c)(1). However, a treating source's opinion may be disregarded in favor of other opinions if it is not supported by substantial

---

[8] "Other factors" can include information claimants or others bring to the Social Security Administration's ("SSA") attention, or of which it is aware, which tend to support or contradict a medical opinion. "For example, the amount of understanding of [SSA] disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in [a claimant's] case record are relevant factors that [SSA] will consider in deciding the weight to give to a medical opinion." 20 C.F.R. § 404.1527(c)(6).

evidence in the record. *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007). Although Dr. Mittauer is Claimant's treating psychiatrist and examined her 13 times over almost four years, eight times prior to writing his opinion, as will be discussed below, Dr. Mittauer's opinion is not supported by the record as a whole. Thus, even though he is Claimant's treating psychiatrist, I find that his opinion is not entitled to more weight than the ALJ gave it.

### b.   *Treatment Relationship*

"Generally, [ALJs] give more weight to the medical opinions from [a claimant's] treating sources. . . . When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. at § 404.1527(c)(2)(i). In addition, "the more knowledge a treating source has about [a claimant's] impairment(s), the more weight the [ALJ] will give the source's opinion." *Id.* at § 404.1527(c)(2)(ii). As discussed, Dr. Mittauer is Claimant's treating source. In addition, Dr. Mittauer has treated Claimant for her mental health issues and therefore Dr. Mittauer's opinion should generally be given increased weight. *See Shontos v. Barnhart*, 328 F.3d 418, 426-27 (8th Cir. 2003). The ALJ implicitly acknowledged Dr. Mittauer's treating relationship with Claimant by noting that Dr. Mittauer provided a treating source opinion. (AR at 403.) However, when the opinion is not supported by the record as a whole, it is not entitled to controlling weight. *See Casey*, 503 F.3d at 692. For the reasons discussed below, I find that the ALJ properly weighed Dr. Mittauer's opinion.

### c.   *Supportability*

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). It is unclear what, exactly, Dr. Mittauer based his conclusions on. Dr. Mittauer stated that

Claimant had "some improvement in depression and anxiety, but [that] symptoms persist." (AR at 340.) He went on to note the extreme limitations and exhaustive list of symptoms documented above. However, Dr. Mittauer did not support this opinion with examples from Claimant's life regarding how her mental health issues affect her or about how she is limited by her depression or anxiety. As previously noted, all he said was, "poor concentration, fatigue, panic attacks, distracted so may not finish tasks," and "difficulties with timely task completion, works slowly, problems with comprehension." (*Id.* at 342, 345.)

I find that Dr. Mittauer's opinions are not supported by his treatment notes. The ALJ cited exhibits 8F and 10F, which is where Dr. Mittauer's pre-opinion treatment notes can be found. While it may have been preferable that the ALJ cite specific treatment notes that undermined Dr. Mittauer's opinion, I find that the citation to the exhibits suffices. All the documents I rely on in the following analysis come from exhibits 8F and 10F, the only notes written by Dr. Mittauer at the time he wrote his opinion. An "arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably ha[s] no practical effect on the outcome of the case." *Benskin v. Bowen,* 830 F.2d 878, 883 (8th Cir.1987).

While Claimant came to Dr. Mittauer with concentration difficulties and "classic symptoms of ADHD" in April 2010, the only treatment notes related to concentration after that initial meeting are notes about Claimant forgetting to take her Ritalin on schedule in June and August 2010, in part because of her irregular sleep patterns, and a note that she was out of Ritalin in April 2011. (AR at 279, 285, 377.) Other than that, Claimant reported in December 2010 that Ritalin helped her with "motivation and concentration" and reported in August 2011 that the Ritalin "improved her energy, focus, and concentration." (*Id.* at 274, 367.) An impairment that is controlled with medication is not considered disabling. *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (citing

*Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004); 20 C.F.R. §§ 404.1530(b), 416.930(b)). On a somewhat related note, I can find no mention of Claimant being distracted other than the initial diagnosis of ADHD in any of Dr. Mittauer's treatment notes, so inclusion of that limitation in his opinion is unsupported.

Except for a notation of erratic sleep patterns during their first session, Dr. Mittauer's treatment notes do not document "fatigue" as an ongoing medical issue, only listing "hypersomnia," (a condition that refers to excessive daytime sleepiness) once and fatigue once as medical impressions. (AR at 274 (hypersomnia—"down mood" because Claimant unable to make a living as a writer; initial insomnia so sleeps late in the mornings and has difficulty getting up and going in morning); 279-80 (fatigue—"She sleeps about 9 hours at night and sometimes has difficulty falling asleep. She is fatigued during the day.") Two other notes mention sleep difficulties: One states that Claimant had some insomnia before Lasik surgery because she had to discontinue trazadone in preparation for that surgery. (*Id.* at 367.) The other note states that Claimant was sleepy, which she thought was due to grief over her father's death. (*Id.* at 363.) Notably, Claimant had the insight and coping skills to realize this and began sleeping less in the day so she could sleep more at night. (*Id.*) Importantly, Dr. Mittauer often suggested life-skill strategies to Claimant so that she would be busy during the day and stay awake during daylight hours and be tired at night. For example, as early as his first meeting with Claimant, he suggested that she "do fun things with friends, do fun activities, and exercise. . . . [and] that she get a job and and stay busy during the day." (*Id.* at 290.) When she started sleeping during the day again after her father died, he "recommended she exercise on a regular basis and try to get up earlier in the morning and schedule things for her day." (*Id.* at 378.) Claimant took his advice, and over the course of time covered by the treatment notes in exhibits 8F and 10F started going to mass several times a week; attending Bible study; volunteering; visiting family; gardening; walking for exercise; and

even attended her high school reunion. (*Id.* at 274, 279, 363, 367.) Thus, while fatigue is mentioned in Dr. Mittauer's notes, it has not been a constant problem, having only been mentioned as a medical impression twice prior to drafting his opinion. This part of Dr. Mittauer's opinion is not supported by his treatment notes.

In addition, while Dr. Mittauer's notes do document Claimant's on-going history of panic attacks, nowhere in his notes are they documented to produce the symptoms listed on the checklist: "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week." (*Id.* at 341.) Dr. Mittauer crossed out and changed several items on the checklist. I assume if he meant to change this definition, he would have done so. However, the only explanation of Claimant's panic attack symptoms says that she has "shortness of breath, heart pounding, nausea, and sometimes vomiting." (*Id.* at 287.) Claimant's panic attacks are triggered by stress. (*Id.*) However, Claimant's panic attacks seem to resolve after the stressors resolve. (*Id.* at 377.) Dr. Mittauer's notes document panic attacks triggered by arguments with Claimant's mother, stress due to her diagnosis of a personality disorder, her father's death, and family stress over the holidays. (*Id.* at 287, 363, 377.) One note from August 2011 states that Claimant "still has panic attacks," but does not give any specific reason for the attacks. (*Id.* at 367.) However, the rest of that note contains very upbeat self-reports from Claimant, and Dr. Mittauer's impression was that Claimant's depression was "much improved," even though she still had "some anxiety." (*Id.*at 367-68.)

Claimant's GAF score for that same August 2011 visit, "a numeric [score] ranging from zero to one hundred used to rate social, occupational and psychological functioning," was 75, which was the highest GAF score in the year preceding his opinion, not the 55 that he noted as Claimant's high GAF score on page 1 of his opinion (AR at 340). *See Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1. (8th Cir. 2009) (citing *Diagnostic*

*and Statistical Manual of Mental Disorders*, 32 (4th ed. Am. Psychiatric Ass'n 1994)). Someone with a GAF score between 71 and 80 would have symptoms that, if present, "are transient and expectable reactions to psycho-social stressors . . . [and] no more than slight impairment[s] in social, occupational, or school functioning. . . ." *D'Angelo v. Astrue*, No. 4:09CV0386 TCM, 2010 WL 1257682, at *4 (E.D. Mo. Mar. 25, 2010) (ellipses in original) (citation omitted). Dr. Mittauer also assigned Claimant a GAF of 58 on April 27, 2011.[9] (AR at 377.) "A GAF of 51 to 60 indicates the individual has [m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning. . . ." *Pate-Fires*, 564 F.3d at 938 n.3 (brackets and ellipses in original) (citation omitted).

Dr. Mittauer's notes support the part of his opinion that states Claimant has depression and anxiety that is ongoing, despite treatment. However, Dr. Mittauer's notes document improvement in both conditions with treatment and/or medications. As discussed above, if an impairment "can be controlled by treatment or medication, it cannot be considered disabling." *Brace*, 578 F.3d at 885. Between April 2010 and December 2011, Dr. Mittauer noted that Claimant's depression was exacerbated by her life stressors: She first went to see him after a break-up with her boyfriend (AR at 287); in June 2010, she was stressed over her personality disorder diagnosis, her brother's impending move to Europe, and stress with her mother (*Id.* at 285); but by August 2010, her depression had improved and was only periodically flaring. (*Id.* at 279-80.) In

---

[9] In recent years, the SSA "has recognized, and [the Eighth Circuit has] noted, that GAF scores have limited importance." *Nowling v. Colvin*, 813 F.3d 1110, 1116 (8th Cir. 2016) (quoting *Jones v. Astrue,* 619 F.3d 963, 973-74 (8th Cir. 2010) ("Moreover, the Commissioner has declined to endorse the [GAF] score for use in the Social Security and [Supplemental Security Income] disability programs and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.") (noting internal citations omitted)). However, the difference between the GAF scores in Dr. Mittauer's treatment notes and his opinion are an important factor in weighing the supportability of his opinion.

December 2010, Claimant was depressed because she could not make a living as a writer and because she had gained weight. (*Id.* at 274) and in April 2011, her "variable" depression had worsened when her father died. (*Id.* at 377.) In April 2011, Claimant told Dr. Mittauer that she thought her mood worsened prior to her menses and that her premenstrual depression and anger had hurt her relationships. (*Id.*) By August 2011, Claimant had "no significant depressive symptoms" (*Id.* at 367) and in December 2011, Claimant told Dr. Mittauer that "she has been feeling pretty good," in spite of feeling "somewhat depressed" over her father's death. (*Id.* at 363.) These notes, coupled with the activities Claimant has been able to do, and indeed has been encouraged to do by Dr. Mittauer, do not support a finding that Claimant is disabled by her depression, although she is somewhat impaired by it.

Dr. Mittauer's treatment notes say relatively little about Claimant's anxiety, from April 2010 until December 2011, other than it being a diagnosis, when he wrote his opinion. In June 2010, Dr. Mittauer stated that Claimant was "having anxiety," but by August, her depression and anxiety were improved. (*Id.* at 279, 286.) In December 2010, Dr. Mittauer noted "some anxiety," but did not note how anxiety was affecting Claimant. (*Id.* at 275.) Again, in April and August 2011, Dr. Mittauer's treatment notes mention anxiety, but no specific examples from Claimant are included. (*Id.* at 368, 378.) However, in August 2011, Claimant also said felt like "she [was] going in the right direction" and her GAF score from that session was a 75. (*Id.* at 367.) Therefore, while Claimant has documented anxiety, it seems to be responding to treatment. Dr. Mittauer's notes do not document any overarching concerns about Claimant's anxiety.

Regarding the long checklist of "signs and symptoms" that Dr. Mittauer included in his opinion, I find that many of the items Dr. Mittauer selected are completely at odds with his treatment notes. For example, "Anhedonia or pervasive loss of interest in all activities" is inconsistent with his treatment notes that document Claimant's increasing

interest in church activities, and desire to get out the house and walk several miles a week for exercise. (*Id.* at e.g., 363, 367.) More importantly, the mention of anhedonia in Dr. Mittauer's treatment notes is from his first session with Claimant, and says that Claimant "denied anhedonia." (*Id.* at 287.) Dr. Mittauer selected "Blunt, flat, or inappropriate affect," but his treatment notes consistently stated that Claimant's affect was "serious, restricted, and appropriate" or even "serious, restricted, and appropriate, but optimistic" (*Id.* at, *e.g.*, 274, 279, 285, 363, 367, 377), except for the first session, when Dr. Mittauer found Claimant's affect "somewhat timid, sad, tearful, and appropriate." (*Id.* at 289.) Nowhere did he ever document an inappropriate affect. Dr. Mittauer checked "Intense and unstable interpersonal relationships and impulsive and damaging behavior" and "Impairment in impulse control," but the only place in the treatment notes where possible impulse control impairment is mentioned is where Claimant said that she thought her PMS-related anger has disrupted her family and work relationships. (*Id.* at 377.) In response to Claimant's insights about her PMS-related anger, Dr. Mittauer told Claimant to keep a calendar and to monitor her moods. (*Id.*) Although Claimant did have "difficulty thinking or concentrating" and, perhaps "distractibility" when she first came to Dr. Mittauer, Ritalin has helped her concentration immensely, and her ADHD seems to be well-controlled on that medication, which means that this is no longer a disability for DIB and SSI purposes. *See Brace*, 578 F.3d at 885.

Although Dr. Mittauer selected "Seclusiveness"[10] and "Emotional withdrawl or isolation," his treatment notes do not support these symptoms. His notes indicate that Claimant wants to engage with the world and is actively trying to do so by attending church services several times a week, volunteering, and always being "neatly groomed and dressed" when at her appointments with Dr. Mittauer. Dr. Mittauer also checked

---

[10] Seclusiveness is the "tendency to seclude, especially oneself." *Random House Webster's Unabridged Dictionary* 1729 (Wendalyn R. Nichols, Ed. Dir., 2d ed. 2002).

"Emotion lability" as a symptom Claimant experiences. Emotional lability is "emotional instability; rapidly changing emotions."[11] There is no support for this in Dr. Mittauer's notes other than the aforementioned self-report of PMS-related mood swings. Dr. Mittauer consistently noted that Claimant's "insight, impulse control, and social judgment were intact. (*Id.* at 274, 279, 285, 289, 363, 367, 377.) The same goes for "Paranoid thinking, "memory impairment," and "maladaptive behavior." Dr. Mittauer never mentioned paranoia, memory difficulties, or maladaptive behavior in his notes.[12] An ALJ is entitled to discount a physician's opinion that is contrary to his treatment notes. *See Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005).

Therefore, I find that Dr. Mittauer's opinion is not supported by his own treatment notes, and the ALJ's decision should not be reversed based on this factor. In fact, even if I were to find that Dr. Mittauer's opinion is supported by other evidence in the record as a whole, this lack of support in his own treatment records is fatal to his opinion, and therefore I find that a remand to re-evaluate his opinion once again would be futile. *See Gibbs v. Berryhill*, Civil No. 2:17-CV-02105-PKH-MEF, 2018 WL 3407494, at *9 (W.D. Ark. June 27, 2018) (finding that remand would be futile in case where plaintiff failed to show any resulting harm or restrictions from back impairment beyond light RFC already imposed by ALJ).

### d. Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). In support of his conclusion that Dr. Mittauer's opinion is not supported by other evidence in the record as a whole, the ALJ cited January 2012 evidence from

---

[11] *Dorland's Illustrated Medical Dictionary* 994 (32nd ed. 2012).
[12] Claimant was hospitalized in 2012 for schizophrenia related to paranoia (AR at 346-55), but at this juncture I am only assessing support in Dr. Mittauer's own treatment notes. At the time Dr. Mittauer wrote his opinion, Claimant had not yet been hospitalized.

the Abbe Center that indicated only "'some' social withdrawal, denial of hopelessness or helplessness, and a cooperative but depressed mood. Further, the claimant was given a GAF of 55, indicating only moderate limitations." (AR at 409.) The ALJ seemed to be citing a January 31, 2012 treatment note from Karen Penick, the social worker who worked with Claimant for a number of years. Importantly, this note also indicates that Claimant was noncompliant with her medications, and Ms. Penick "strongly encouraged" Claimant to take her medication as prescribed. (*Id.* at 361-62.) A claimant's failure to take medications as prescribed undermines the claimant's disability claim. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (citation omitted). The record as a whole fails to support Dr. Mittauer's opinion because Claimant's symptoms are better when she is compliant with her medication, and, predictably, worse when she is noncompliant. (*Id.* at 281, 283, 367.) As previously discussed, impairments that are controlled with medication are not disabling. *Brace*, 578 F.3d at 885.

Although Claimant continued to have depression, she was appropriately dressed and groomed for her appointments with Ms. Penick during the relevant time period before Dr. Mittauer wrote his opinion. (*E.g.*, AR at 276, 281, 320.) As discussed above, Claimant was not housebound, but was able to join church groups, volunteer, and walk several miles a week for exercise, even if it was initially difficult for her. She discussed these activities with Ms. Penick. (*Id.* at 276, 321, 365.) In spite of her depression, Claimant was able to plan and execute a garage sale in June 2011, which was an accomplishment for her. (*Id.* at 373.) During this time, Claimant also mentioned trying to find a job or trying to return to school. (*Id.* at 276, 292, 384.) Claimant would also spend long hours at night on Facebook or on the internet, which she knew was not a positive way to spend time, and then would be tired in the morning. (*Id.* at 276-77, 320, 321.) She eventually quit Facebook and now does not become as exhausted around people as she used to become. (*Id.* at 365.) Even before Claimant started treating with Dr.

Mittauer, Claimant realized that she "does better if she has some type of routine and schedule in her life" and she was contemplating either returning to teaching or going back to school for a library science degree and was able to weigh the pros and cons of those choices with Ms. Penick. (*Id.* at 300.) Although the record does not show if Claimant actually followed through with plans to find work, looking for work is inconsistent with a claim for benefits. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (citation omitted).

Records and reports added to the administrative record after the first hearing also support the ALJ's conclusion. Claimant does not take issue with how much weight the ALJ chose to give each of these opinions. I will discuss each new opinion, in turn.

### 1. Dr. Stientjes's Opinion

Dr. Stientjes is a consulting psychologist who examined Claimant once. The ALJ gave reduced weight to his opinion because Dr. Stientjes appeared "to have accepted historical diagnoses without fully assessing their presence," which seems to mean that Dr. Stientjes accepted the diagnoses without assessing whether the diagnoses were still current. (AR at 405.) Moreover, Dr. Stientjes concluded that Claimant's "[p]rospect of sustained gainful employment is poor," which was a conclusion he was not qualified to make in this context. (*Id.* at 912.) "A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (quoting *Stormo,* 377 F.3d at 806).

In addition, much of Dr. Stientjes's examination consisted of obtaining self-reports from Claimant, including her statement that after a breakup with her boyfriend and the death of her father, "she virtually stayed in bed for two years." (AR at 911.) Although other records discussed above note that Claimant had a reversed sleep pattern,

they also note that she was taking steps to be more active and engaged in the world during that time period by joining church groups, walking for exercise, and attending her therapy sessions on a regular basis. In December 2011, Claimant reported that she was even able to process her father's death in a positive way by planting a memory garden as a tribute to him. (*Id.* at 363.) Claimant also self-reported to Dr. Stientjes that she experienced every symptom except "agitation" and "being pushed" on the Beck Depression Inventory ("BDI"), and rated every symptom as "severe" on the Beck Anxiety Inventory ("BAI"). (*Id.* at 911.)

In spite of these self-reports, Claimant read a passage adequately, demonstrated good inferential comprehension and content recall, properly followed written instructions, accurately organized and completed a clock drawing, accurately followed three-step oral instructions, demonstrated 75% content recall, had good interpretation of a story that was read to her, and performed adequately on other tasks related to attention, concentration, and memory on her Attention Concentration and Memory Tests. (*Id.*) Dr. Stientjes presumed Claimant had "average general ability" based on her vocabulary and content of expression, however, her "pace of information processing [was] sluggishly slow with considerable verbal mediation." (*Id.* at 911-12.) Dr. Stientjes gave Claimant a GAF score of 55 for this visit. (*Id.* at 913.) A GAF score of 55 indicates only moderate impairments. *Pate-Fires*, 564 F.3d at 938 n.3. This is at odds with a conclusion of that says Claimant's prospects of sustained gainful employment is poor and with Dr. Stientjes's conclusion that Plaintiff could manage only slow or haphazard implementation of simple instructions, and could not sustain activities without external assistance. (*Id.* at 912.)[13]

_____

[13] I find that Dr. Stientjes's conclusion that Plaintiff could manage only slow compliance is included in the ALJ's RFC because the RFC does includes "no production rate pace." (AR at 400.)

In addition, since Claimant's results on the objective tests that Dr. Stientjes administered are higher than the self-reports that he includes in his report, it seems that much of Dr. Stientjes's conclusion is based on Claimant's self-reports, which, as discussed above, are inconsistent with Claimant's actual activities during the period. Some impairments are documented, but not the complete inability to get out of bed for years that she reported to Dr. Stientjes. Because a consulting psychiatrist's opinion as to a patient he has seen only once does not constitute substantial evidence, *see Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994), the ALJ did not err in giving Dr. Stientjes's opinion reduced weight. Therefore, because Dr. Stientjes's own notes do not do not support his conclusion in much the same way as Dr. Mittauer's notes not support Dr. Mittauer's conclusion, I find that Dr. Stientjes's opinion does not undermine the ALJ's conclusion.

### 2. Ms. Moyle's Opinion

Social Worker Tanya Moyle is Claimant's community support worker and she usually sees Claimant at Claimant's home once or twice a month. (AR at 447.) Ms. Moyle testified at the hearing that Claimant "kind of obsesses in her thoughts" and that Claimant would go to a new job, but might obsess about something someone said to her until she had some kind of outburst. (*Id.* at 455-56.) On June 30, 2015, Ms. Moyle wrote an opinion stating that Claimant's depression, anxiety, and lack of motivation hold her back from doing even routine things like opening her mail, bathing, and completing daily tasks. (*Id.* at 1020.) Ms. Moyle also opined that although Claimant keeps regular appointments with her and is receptive to staff feedback, Claimant has trouble with interpersonal relationships and effective communication as a result of poor communication skills and racing thoughts. (*Id.*) The ALJ gave Ms. Moyle's opinions only some weight because Ms. Moyle did "not appear to be medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and

symptoms." (*Id.* at 408.) He also noted that the none of Claimant's treatment notes from her psychologist or psychiatrist mention hygiene problems, complaints of racing thoughts, or difficulty leaving home. (*Id.*) Ms. Moyle agreed that Claimant does take care of her hygiene when she has to go out into the community but noted that although Claimant has good intentions of getting out to do things, she often cancels appointments so she does not have to go. (*Id.* at 452-53.) Based on this testimony, it seems that Claimant chooses not to bathe or to engage with the broader world when she is at home, but if she actually has to leave the house, she is able to do so as demonstrated by her ability to attend doctor and therapy appointments, mass, and church activities, and to be appropriately dressed and groomed when she does. In addition, neither Dr. Mittauer nor Ms. Penick, both who treated Claimant for years, discussed racing thoughts of the type that Ms. Moyle referenced. Claimant's failure to mention these difficulties in her life to her healthcare providers undermines the existence and severity of these symptoms. Therefore, Ms. Moyle's opinion does not undermine the ALJ's conclusion.

### 3.     Ms. Penick's Opinion

On June 13, 2011, Karen Penick, Claimant's social worker and counselor, provided an opinion on the same kind of form that Dr. Mittauer used for his opinion. (*Id.* at 331-36.) Although this is not a new opinion filed in conjunction with the second hearing, it is evidence the ALJ weighed and mentioned in his opinion. It is also evidence Judge Scoles ordered the ALJ to reassess on remand. Therefore, I will address the opinion. Ms. Penick checked off that Claimant had more than one year's history of an inability to function outside of "a highly supportive living arrangement" and that she had a "complete inability to function independently outside the area of [her] home." (*Id.* at 335.) Although Ms. Penick stated that Claimant had limited but satisfactory abilities to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related

decisions, and ask simple questions or request assistance (*Id.* at 333), she also opined that Claimant had extreme restrictions of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and that Claimant would have four or more episodes of decomposition within a 12 month period, each of at least two weeks duration (*Id.* at 335). Ms. Penick indicated that she gave Claimant GAF scores between 53 and 55 during the previous year. (*Id.* at 331.)

The ALJ gave Ms. Penick's opinion partial weight because it was inconsistent with her own treatment notes, the medical evidence in the record as a whole, and because Ms. Penick is not an acceptable medical source under the regulations. (*Id.* at 409.) Although Ms. Penick's opinion seems to support Dr. Mittauer's opinion, I agree with the ALJ that if examined closely, the opinion does not support a finding of disability. First, Ms. Penick's treatment notes from the time that she wrote her opinion do not document the level of incapacity that Ms. Penick included in her opinion. Rather, treatment notes from March 2, 2011 state that Claimant wanted to volunteer in the community, that she was sleeping less, and that she understood that she spent too much time on Facebook. (*Id.* at 321.) Claimant was going to give Facebook up for Lent, and Claimant's sadness at that time was related to her father's illness. (*Id.*) Two weeks later, Claimant told Ms. Penick that she and her mother had joined Weight Watchers, that she was thinking about joining the YMCA, that she showers every day, and that she realized that she still spent too much time on Facebook. (*Id.* at 320.) Although Ms. Penick noted that Claimant might have mild paranoia and thought distortions, presumably related to Claimant thinking that chance encounters with her ex-boyfriend and his mother were more than coincidences, she also noted that Claimant had made significant progress with her medication compliance; that Claimant took the initiative to meet with her church group; and that Claimant had spent time visiting her mother, who had been in the hospital. (*Id.* at 320, 322.) On the day she wrote her opinion, notes from a session with Claimant state that in

spite of being depressed several days out of the week, Claimant was happy that she had planned and executed her garage sale and had been able to walk several days in the prior week. (*Id.* at 373.) Two weeks after Ms. Penick wrote her opinion, she noted that Claimant's self-consciousness about her weight, not any mental health condition, was keeping her from getting out of the house because she was worried about what people would think of her. (*Id.* at 371.)

Licensed Mental Health Counselor Jennifer Atherton took over Claimant's case from Ms. Penick and documented that Claimant spent their sessions in May, June, and July 2015 discussing situational stressors. (*Id.* at 1002 (mother threatened to kill Claimant); 1021 (mother threatened to kill herself); 1023 (upcoming social security hearing and worries that family members were mad at her)). In all of these sessions, Claimant was alert and oriented to person, place, and time. Her behavior was cooperative and appropriate, her psychomotor activity was normal and appropriate, her thought process and content were logical and appropriate, and her memory was intact. Although Claimant's mood was anxious, her affect was broad (normal). While Claimant reported ongoing depression, lack of motivation, fatigue, and anxiety, she was appropriately dressed and well groomed, and in June she was late to her session because "she had a social engagement" the previous night. (*Id.* at 1021.)

Therefore, Claimant's depressive symptoms were not so severe that they were keeping her in the house to the degree that Ms. Penick, and ultimately, Dr. Mittauer, stated they were. As Ms. Moyle testified, when Claimant wants to leave the house, she can present herself appropriately to the community. (*Id.* at 452.) Accordingly, I find that the record as a whole supports the weight given to Dr. Mittauer's opinion because Claimant is able to engage with the world as demonstrated by her ability to join her church group, regularly attend mass, and be consistently well groomed for her medical appointments. Moreover, the objective tests she took for Dr. Stientjes did not support a

finding of disability and Claimant's symptoms seem to respond well when she is compliant with her medication regimen. In addition, recent notes from Ms. Atherton indicate that Claimant was only discussing situational stressors related to her mother's mental health and to her own Social Security disability hearing, which indicates that Claimant's condition improved over time, in spite of her still having some lingering depression, anxiety, and fatigue.

### e. Specialization

"[The ALJ will] generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Mittauer is a board-certified psychiatrist who rendered an opinion in his area of specialty. (AR at 340-45.) Therefore, the ALJ was required to credit Dr. Mittauer's opinion, if it was supported by the record. *See Brown v. Astrue*, 611 F.3d 941, 951, 954 (8th Cir. 2010) (affirming ALJ's decision to give greater weight to opinion of claimant's treating psychiatrist than to opinion of her family physician when claim was based on mental health issues).

### f. Other factors

Claimant argues that the ALJ made inconsistent statements regarding her activities of daily living, and thus those activities are insufficient grounds upon which to base his decision. I will address each statement Claimant identifies, in turn. Claimant first takes issue with the ALJ's statement that "many of [Claimant's] daily activities appear to be limited more by her psychological issues than by her physical issues." (Doc. 13 at 7 (citing AR 403).) This sentence appears in the middle of paragraph discussing Claimant's physical limitations from high blood pressure, sleep apnea, and pre-diabetes. (AR at 403.) Claimant's complaint here is unclear. The ALJ's comment may seem misplaced in the middle of this paragraph, but it does not seem at odds with Claimant's arguments, which are that Claimant's major disability is based on her mental health issues. (*Id.* at

464) (Claimant's attorney asking ALJ at hearing to consider if Claimant meets two categories of mental health impairments). Claimant has not argued that the ALJ gave improper weight to her physical impairments.

Next, Claimant takes issue with the ALJ's statement that "even if the [Claimant's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the [Claimant's] medical condition." (Doc. 13 at 7 (citing AR at 406).) As discussed above, many limitations were caused by Claimant's inverted sleep pattern. When Claimant stayed up at night on Facebook and the internet and slept during the day, she did not get much done during the day. However, the record as a whole demonstrates that Claimant is able to shower, dress, and get to medical appointments when necessary. She can join social organizations like her church group, and is held back not by her mental illness, but by worries over her weight. Even before Claimant got her CPAP machine in early 2015, she knew what she had to do to practice good sleep hygiene and discussed with her health care providers staying off the computer at night so she could be active during the day and sleep at night. Therefore, based on the ALJ's findings regarding Claimant's RFC and Claimant's credibility, this statement by the ALJ is not unsupported.

Claimant also notes that the ALJ wrote, "[Claimant] has described significant symptoms and daily activities that are fairly limited," while also stating Claimant is capable of "a wide range of activities that are inconsistent with her allegations of disabling limitations." (*Id.* at 7 (citing AR at 406-07).) For the reasons stated above, I do not find these two statements at odds. Claimant has described significant symptoms and limited daily activities. However, treatment notes from her healthcare providers indicate that she is capable of more and her community support worker, Ms. Moyle, testified that Claimant can present herself appropriately to the world when she chooses to do so.

### iii.    Conclusion

After a thorough review of the entire record, I find that the ALJ's opinion regarding Dr. Mittauer's opinion is supported by substantial evidence in the record as a whole and should not be disturbed. Accordingly, I recommend that the ALJ's decision on this issue should be affirmed.

### B.    Substantial evidence supports the ALJ's conclusions at step 5.

The ALJ found that in spite of her limitations, Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform a range of sedentary to light work . . . . in that the claimant is capable of carrying/lifting twenty pounds occasionally and ten pounds frequently, can sit for six hours of an eight hour day, and can stand/walk for four hours of an eight hour day. The claimant can do simple, routine, and repetitive tasks, have no contact with the public, and occasionally with coworkers, and supervisors and no production rate pace.

(AR at 400.)  In adopting this RFC, the ALJ weighed all the medical opinion evidence in the record, and gave the opinions of the DDS non-examining reviewing physicians ("the reviewers") substantial weight, the most weight he gave to any single medical opinion.  (*Id.* at 410.)  The reviewers included a limitation in their opinions that Claimant retained the ability to "perform simple, repetitive tasks consisting of 1 to 2 step commands . . . ." (*Id.*  at 542.)

Claimant argues that by giving these opinions so much weight, the ALJ incorporated the "1-to-2-step command" limitation into the RFC, and that jobs posited by the VE at the hearing and included by the ALJ in his opinion are 2-and 3-step command jobs, which means that the case must be remanded for the ALJ to proffer new hypotheticals to VE that contain the 1-to 2-step command limitation.

The Commissioner responds that there is nothing indicating that because the ALJ chose to give the opinion substantial weight, he meant to adopt the 1- to 2-step limitation. In addition, the Commissioner asserts that the Marker II job satisfies the 2-step limitation,

an argument Claimant seems to concede. (*See* Doc. 13 at 9 n.6 (noting that the jobs cited by the VE are "Reasoning Level 2 or Reasoning Level 3" jobs).) Finally, the Commissioner argues that since the ALJ did not limit his RFC to any specific number of steps, jobs that require up to Reasoning Level 3 were allowed since Level 3 Reasoning jobs are consistent with simple, concrete instructions.

First, I agree with the Commissioner that the RFC did not incorporate a 1- to 2-step limitation simply because the ALJ mentioned it earlier in his opinion. Although the ALJ's mention of this limitation causes slight confusion, I find that the ALJ meant to include in the RFC only those limitations he actually wrote into it. Nowhere in the RFC is a 1- to 2-step limitation mentioned. In this way, the instant case can be distinguished from *Stanton v. Comm'r, Soc. Sec'y Admin.*, 899 F.3d 555 (8th Cir. 2018) and *Thomas v. Berryhill*, 881 F.3d 672 (8th Cir. 2018), upon which Claimant relies, because in those cases, the RFCs limited claimants to "simple one-to-two-step instructions" and "1 to 2 step tasks." *See Stanton*, 899 F.3d at 557; *Thomas*, 881 F.3d at 677. Moreover, an ALJ is entitled to choose those parts of a medical source's opinion that are supported by the record, and thus will be adopted, and those which will not be adopted. *See Pirtle v. Astrue*, 479 F.3d 931, 934 (8th Cir. 2007).

Second, to the extent the 1-to-2-step limitation was included in the RFC, I find that the Marker II job satisfies this limitation. *See* 1991 WL 687992 (Marker II listing in *Dictionary of Occupational Titles*). There are 85,000 Marker II jobs in the national economy, which is a significant number of jobs. *See Welsh v. Colvin,* 765 F.3d 926, 930 (8th Cir. 2014) (holding that 36,000 jobs constituted a significant number of jobs). Therefore, I find the case need not be remanded on this basis because a significant number of jobs proffered by the VE satisfy the 2-step limitation that Claimant wants, assuming, *arguendo*, the RFC included this limitation.

Finally, I find that the jobs cited by the VE satisfy the RFC that was, in fact, included in the ALJ's opinion because the ALJ did not include a specific number of steps in the RFC. Claimant argues that some of the jobs cited by the VE require up to Reasoning Level 3, which is too high given her limitations.[14] However, the Eighth Circuit has held that a claimant who could follow "simple, concrete instructions" could do a job requiring level 3 reasoning and a claimant who was limited to unskilled work could do jobs requiring level 3 reasoning. *See Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 367 (8th Cir. 2007) ("simple, concrete instructions"); *Renfrow v. Astrue*, 496 F.3d 918, (8th Cir. 2007) (unskilled work). Thus, Claimant, whom I find can work with the limitations listed in her RFC, something she does not contest, can perform the jobs requiring level 3 reasoning. Notwithstanding this determination, as discussed above, I have already determined that a significant number of Marker II jobs exist in the national economy, even without the reasoning level 3 jobs. Therefore, whether or not Claimant can perform jobs requiring level 3 reasoning, there are still a significant number of jobs Claimant can perform. Accordingly, I recommend that the ALJ's decision on this issue should be affirmed.

## C.     Claimant failed to timely raise her Appointments Clause argument under Lucia v. SEC.

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that Social Security Administration ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*.

---

[14] Every job listed by the VE, other than the Marker II job, requires level 3 reasoning. (Doc. 13 at 9 n.6 (listing Westlaw cites to specific job titles in the *Dictionary of Occupational Titles*, which contains information on reasoning levels required for specific jobs).)

Claimant asserts this Court should vacate the denial of benefits by ALJ Basse and remand the case for decision by what she contends is a properly-appointed ALJ. Claimant admits that she is asserting her Appointments Clause challenge for the first time in her opening brief to this Court. She argues that because *Lucia* was not decided until after her administrative hearing, this timing should not act as a bar to this argument. In addition, Claimant also argues that because EM-18003 made it futile for her to raise this argument before the Social Security Administration ("SSA"), she should not be barred from raising the issue for the first time before this Court.[21] (Doc. 13 at 12-13.)

This Court has ruled in favor of the Commissioner on similar claims on four occasions. *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018), *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

Most recently, this Court ruled as follows:

> The United States District Court for the Central District of California has considered *Lucia* in the Social Security context, holding that claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings. *See Trejo v. Berryhill*, Case. No. EDCV 17-0879-JPR, 2018 WL 3602380, at *3 n.3 (C.D. Cal. July 25, 2018). I find this holding to be consistent with [relevant precedent]. Stearns' argument that an issue need not be raised if the ALJ does not have authority to decide it does not hold water under *Lucia*. *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83).

---

[21] EM-18003 is an emergency message issued on January 30, 2018 instructing ALJs to acknowledge Appointments Clause arguments while prohibiting them from "discussing or making any findings" on those arguments. (Doc. 13-1.)

> In *Lucia*, the Supreme Court acknowledged the challenge was timely because it was made before the Commission. *Id.* In the context of Social Security disability proceedings, that means the claimant must raise the issue before the ALJ's decision becomes final. . . . *Lucia* makes it clear that this particular issue must be raised at the administrative level.
>
> Because Stearns did not raise an Appointments Clause issue before or during the ALJ's hearing, or at any time before the ALJ's decision became final, I find that she has forfeited the issue for consideration on judicial review. As such, her request for remand on this basis is denied.

*Stearns*, 2018 WL 4380984, at **5–6 (paragraph break added).

All the cases cited above had the same procedural posture (i.e., all administrative hearings were completed before EM-18003 was issued and before *Lucia* was decided, but before the claimants raised the appointment argument for the first time to this Court[22]). The only procedural difference between this case and the cases cited above is that Claimant did not receive her final denial from the Appeals Council until the SSA issued EM-18003. EM-18003 was issued on January 30, 2018 and the Appeals Council denied review of Claimant's case on March 27, 2018. I find that this procedural difference does not change the basis for the decisions in the cited cases. Moreover, the Eighth Circuit has held that a party forfeits an Appointments Clause claim by failing to raise it to the agency. *See Kimberly B. v. Berryhill*, No. 17-CV-5211 (HB), 2019 WL 652418, at *14 (D. Minn. Feb. 15, 2019) (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013)). Therefore, I find that Claimant's request for remand on this basis should be denied.

---

[22] *Lucia* was decided on June 21, 2018. 138 S. Ct. at 2044.

# VI.  CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm the decision of the ALJ and dismiss Plaintiff's case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 11th day of March, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa